## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JOAN GILBERT,

                              Civil No. 09-1990 (JRT/JSM)

                    Plaintiff,

v.

                                        **ORDER DENYING DEFENDANTS'**
METLIFE, INC., and METROPOLITAN              **MOTION FOR SUMMARY**
PROPERTY AND CASUALTY                            **JUDGMENT**
INSURANCE COMPANY (*MetLife Auto
and Home*),

                    Defendants.

---

Frances E. Baillon and Christopher D. Jozwiak, **HALUNEN & ASSOCIATES,** 1650 IDS Center, 80 South Eighth Street, Minneapolis, MN 55402, for plaintiff.

Marko J. Mrkonich and Rhiannon C. Beckendorf, **LITTLER MENDELSON, PC**, 80 South Eighth Street, Suite 1300, Minneapolis, MN 55402, for defendants.

MAR 2 4 2011

Joan Gilbert filed suit against her former employer, Metropolitan Property and

Casualty Insurance Company ("MetLife"), alleging disability discrimination in violation

of the Minnesota Human Rights Act ("MHRA").[1]  Gilbert alleges that she was the only

supervisor not retained when MetLife closed its Bloomington, Minnesota office and

moved the majority of its Bloomington employees into a virtual work environment.  She

was also the only supervisor with a disability, laryngeal cancer.

---

[1] Gilbert sued MetLife as well as MetLife, Inc.  Defendants assert that MetLife, Inc. is an improper defendant, and Gilbert has offered no evidence to the contrary.  Accordingly, the Court dismisses MetLife, Inc. from the lawsuit.

Doc. No. 29

FILED 3/14/11
RICHARD D. SLETTEN
JUDGMENT ENTD
DEPUTY CLERK TSS

The Court denies MetLife's motion for summary judgment because Gilbert has proffered sufficient evidence from which a reasonable factfinder could infer that MetLife did not retain her because of her disability and failed to accommodate her disability.

## BACKGROUND

MetLife provides insurance to individual customers in the United States. (Aff. of Evelyn Watkins, July 29, 2010, ¶ 2, Docket No. 15.) Gilbert worked in the insurance industry for over thirty years, beginning with St. Paul Companies in 1970. (Gilbert Dep. 21–22, Docket No. 19.) She was diagnosed with laryngeal cancer in 1999. (*Id.* at 16.) In 2000, Gilbert was hired by MetLife as a claims adjuster and no-fault supervisor in the company's Bloomington, Minnesota office. (*Id.* at 27–28.) During Gilbert's tenure, the Bloomington office consisted of claim adjusters, who reported to supervisors (such as Gilbert), who in turn reported to managers. (Vietmeier Dep. at 224, Docket No. 19, discussing Ex. 15.) Each unit – no-fault, casualty, auto investigative unit (AIU), and field adjusting – had its own claim adjustors, supervisors, and managers. (*Id.*) Gilbert was promoted to casualty supervisor in September 2004 where she remained until her termination in 2008. (Gilbert Dep. at 93, Docket No. 19.)

Gilbert was one of three supervisors in the casualty unit. Gilbert asserts that she was a consistently well-performing supervisor, but MetLife describes her as an average performer and points to her struggle with meeting "structured settlement" goals. (*Id.* at 93–94.) Her performance was generally rated a three out of five, which indicates that her

performance "consistently met and sometimes exceeded" MetLife's expectations. (First Aff. of Frances E. Baillon, August 19, 2010, Exs. 3–5, Docket No. 18.)

In 2006, as a result of her laryngeal cancer, Gilbert's larynx was surgically removed through a laryngectomy. (Gilbert Dep. at 29–30, Docket No. 19.) Gilbert received a prosthesis – called a stoma – which enables her to speak, albeit with difficulty. (*Id.* at 150–51.) The laryngectomy has also limited Gilbert's ability to breathe and walk for significant distances. (*Id.*)

Gilbert took an eight week leave of absence for the surgery and recovery period. (*Id.* at 29–30.) When Gilbert returned to work in August 2006, MetLife installed instant messaging on her computer to enable her to communicate through typing instead of speaking; Gilbert did not communicate verbally in the office for the remainder of her employment. (*Id.* at 29–31.) According to Gilbert, she could perform approximately ninety-five percent of her job without speaking. (*Id.* at 132.) She worked from home intermittently and "virtually" supervised two employees. (*Id.* at 52.)

In October 2007, MetLife decided to close its Bloomington office but provide "the large majority of [its Bloomington] associates" the opportunity to "transition to 'virtual' positions." (First Baillon Aff., Ex. 20, Docket No. 18.) Working 'virtually' meant that employees would work from their home offices and report to MetLife's receiving office in Freeport, Illinois. (*Id.*, Ex. 22; Vietmeier Dep. at 30–32, Docket No. 19.)

While MetLife was preparing for its office closures in early 2008, Gilbert informed her supervisor, John Toussaint, that she had to have biopsies taken. (First Baillon Aff., Ex. 13, Docket No. 18.) Before the closure was announced to its employees

in February 2008, MetLife's management expressed concern amongst themselves about Gilbert's medical condition and her ability to work for MetLife after the transition. For example, Mike Romano, MetLife's vice president of field claims operations to whom Watkins reported, suggested discussing "the unique situation of the supervisor in Bloomington that had her voice box removed" and apprising Human Resources Generalist Sally Elrod of the situation "so that we know all the 'rules' that may goven [sic] managing it . . . ." (Second Aff. of Frances E. Baillon, Aug. 19, 2010, Ex. 9, Docket No. 19; Watkins Dep. at 71–76, 91–96, Docket No. 19.)  Michelle Vietmeier, the field director of the Freeport office (the same position held by Watkins in Bloomington), knew that Gilbert was the only Bloomington employee who might take disability leave during the transition. (Vietmeier Dep. at 56–57, 89–91, Docket No. 19.)  She discussed this possibility with Watkins and Romano. (*Id.*; Watkins Dep. at 125, Docket No. 19.)  When asked to describe Gilbert physically, Vietmeier testified that Gilbert was "happy but, you know, fragile, weak." (Vietmeier Dep. at 155, Docket No. 19.)

Watkins testified that she informed Romano that Gilbert's "ability to have a job that talks to customers would be more limited than other associates in the new organization charts, whatever they might be." (Watkins Dep. at 72, Docket No. 19.) Watkins believed that Gilbert's use of instant messaging and email to communicate might limit her ability to succeed in an entirely virtual environment. (*Id.* at 92.) Watkins discussed Gilbert's circumstances with Toussaint, who did not express any concern about Gilbert's ability to work virtually. (*Id.* at 93–95.)  In fact, **Watkins knew Gilbert was already supervising claim adjustors virtually** and had been working from home on

occasion for some time. (*Id.* at 95–96.) With Romano's knowledge and consent, Watkins also consulted with Elrod, as well as MetLife's legal department, about Gilbert's condition. (*Id.* at 75, 81, 86–87.)

Prior to announcing the closure to MetLife's employees, Watkins and Vietmeier chose "high performing" supervisors who had a "pretty good chance" of maintaining their employment with MetLife to conduct interviews for the virtual claim adjustor positions. (Vietmeier Dep. at 99–100, Docket No. 19.) Gilbert was not selected to participate in the interviews, but Nick Thilges – one of two Bloomington casualty supervisors besides Gilbert – was selected. (*Id.* at 99.)

Vietmeier and Romano, with input from Watkins, concluded that the Freeport office would absorb the majority of the files from the Bloomington office but that MetLife would only require two casualty supervisors (one casualty supervisor and one casualty/litigation supervisor) as opposed to the three casualty supervisors currently in Bloomington. (*Id.* at 130.) Two AIU supervisor positions and two no-fault supervisor positions were also posted. (*Id.* at 130–33.) According to MetLife, Vietmeier was ultimately responsible for selecting employees to fill the virtual positions for the Freeport office, subject to final approval by Romano. (*Id.* at 20–21, 46.)

MetLife learned that Gilbert's cancer had returned and on February 8, 2008, granted Gilbert's request to take off work. (Gilbert Dep. at 34, Docket No. 19.) On that same day, Watkins informed the Bloomington office that it would close along with another MetLife office in Indianapolis. (Watkins Dep. at 127, Docket No. 19.) MetLife informed its employees that it planned to retain most of its Bloomington associates in

virtual positions. (Elrod Dep. at 140, Docket No. 19.)   According to MetLife, Bloomington employees were told that no "seniority" rights applied and that they should apply for positions other than their current ones if they so desired and inform their supervisor or manager of their interest. (Watkins Dep. at 57–60, Docket No. 19; First Baillon Aff., Ex. 21, Docket No. 18.)

Toussaint informed Gilbert about the office closure through instant messaging and telephone. (*Id.*, Ex. 19.) **He did not recall, however, specifically informing Gilbert about the need to apply for other positions**. (Toussaint Dep. at 125–26, Docket No. 28.) The online applications listed jobs with generic titles (i.e. adjustor, supervisor, etc.) not specific to each unit such as casualty and AIU. (Elrod Dep. at 54, Docket No. 19.) Gilbert applied for the supervisor positions. (First Baillon Aff., Ex. 39, Docket No. 18.) She did not apply for a position as a claim adjustor. (Gilbert Dep. at 40–41, Docket No. 19.)

Interviews for the virtual supervisors were conducted on or about February 13, 2008 by Tom Burt and Lee Gaffigan, managers in the Freeport office. (*Id.* at 77; Gaffigan Dep. at 27, Docket No. 19.) MetLife offered Gilbert a choice about how to conduct the interview — through verbal or text communication — and Gilbert chose to type her answers on a laptop. (Gilbert Dep. at 78, Docket No. 19.) Each supervisor candidate was asked the same list of questions. (Burt Dep. at 54, Docket No. 28; First Baillon Aff., Ex. 27, Docket No. 18.) Gilbert received an interview score of seven, while the two other Bloomington casualty supervisors, Thilges and Dave Millford, each received scores of thirteen. (Second Baillon Aff., Exs. 49 & 50, Docket No. 19.)

It appears that MetLife retained a degree of flexibility in its hiring practices. For example, Jeff Kemp had been a claims manager in the Bloomington office, and his position was set to be eliminated after the office closures. (Vietmeier Dep. at 51–52, Docket No. 19.) He had received a two on his most recent performance review. (Second Baillon Aff., Ex. 26, Docket No. 19.) On January 4, 2008, before MetLife announced the closures to its staff, Romano stated, by email, "I want Jeff to come out of this as a Senior Supervisor I trust neither of you will disagree with that and that's within our control." (Second Baillon Aff., Ex. 9, Docket No. 19.) In addition, Watkins apparently received an email message with interview questions before the interviews had been conducted, which stated, "[i]f these accidentally fell in to the wrong hands or **if you made mention of what questions might be asked in preparing people for the interviews I would understand and that could remain our secret**." (First Baillon Aff., Ex. 25, Docket No. 18 (emphasis added).) The message was forwarded to several employees including Kemp. (*Id.*)

MetLife offered the casualty/litigation supervisor position to Millford, and the casualty supervisor position to Thilges. (Gilbert Dep. at 47, Docket No. 19.) According to MetLife, both individuals were more qualified than Gilbert. Gilbert has only a high school degree. (*Id.* at 142.) Millford, by contrast, has a law degree and, as had the casualty/litigation supervisor in Bloomington, had handled most of the litigated casualty files there for several years. (Vietmeier Dep. at 128, Docket No. 19.) Vietmeier testified that Burt and Gaffigan were impressed by Millford's interview and that he appeared confident and offered detailed responses to the questions. (*Id.* at 197–200.) Thilges, who

has an insurance designation and a master's degree, had been rated a five out of five in his performance evaluation. (*Id.* at 175.) He was also the "structured settlement champion" of the Bloomington office and received a "Best of the Best" award in 2007. (*Id.*) Gilbert, by contrast, had struggled to meet structured settlement goals. (Gilbert Dep. at 93–94, Docket No. 19.)

On February 19, 2008, Gilbert informed Toussaint of her cancer treatment and medication complications and requested that she be permitted to work from home. (First Baillon Aff., Ex. 52, Docket No. 18.) On February 21, MetLife refused her request because Watkins and Toussaint believed that Gilbert's presence in the office was required, and Gilbert agreed to come into work. (*Id.*, Ex. 31.) That same day, Toussaint and Watkins exchanged emails discussing whether Gilbert was up-to-date with her work. (Second Baillon Aff., Ex. 32, Docket No. 19.) Toussaint suggested that he track her progress on a daily basis going forward. (*Id.*) The email was also forwarded to Romano and Elrod. (*Id.*) Elrod described the message as "a typical performance related e-mail" but testified that **she did not recall receiving similar messages regarding any other supervisors around the same time period.** (Elrod Dep. at 188, Docket No. 19.) Likewise, **Watkins did not remember similar messages about any supervisor other than Gilbert.**[2] (Watkins Dep. at 174–75, Docket No. 19.)

Elrod sent an email to Burt, Gaffigan, and Watkins on February 27, 2008, requesting

---

[2] Toussaint, however, testified that he engaged in this same process for each of the other Bloomington supervisors. (Toussaint Dep. at 128–29, Docket No. 28.)

a detailed description of the supervisor position, . . . [including] **the duties that we don't think Joni Gilbert will be able to do virtually** . . . . I need to be prepared to answer any concerns or complaints that might come up as a result of our hiring decision. It doesn't need to be in any 'formal' format, but I do need **more detail than we currently have**.

(First Baillon Dep. Ex. 33, Docket No. 18 (emphasis added).)

On February 28, 2008, Watkins informed Gilbert that she had not been selected for a virtual position in the Freeport office. (Gilbert Dep. at 45, Docket No. 19.) From Watkins' notes, it appears that she informed Gilbert that while her "past performance is acceptable, . . . it will be difficult for [her] to accomplish the same virtually." (First Baillon Aff., Ex. 35, Docket No. 18.) Watkins' notes also indicate her belief that Gilbert lacked the skill set for the position, but she could not explain or remember which skills Gilbert lacked. (*Id.*; Watkins Dep. at 208–09, Docket No. 19.) In response to Gilbert's inquiry about other open positions, Watkins' notes reflect the following answer: **"We have looked at all the positions and do not feel you could be successful as a claim representative . . . . [M]oving into a virtual concept will be more difficult for [Gilbert]."** (First Baillon Aff., Ex. 35, Docket No. 18 (emphasis added).)

The day after she was informed that MetLife had not rehired her as a virtual casualty supervisor, Gilbert began a disability leave of absence which continued until October 2008. (*Id.*; Gilbert Dep. at 69, Docket No. 19.) During her leave, Gilbert requested reconsideration of MetLife's decision not to retain her. (First Baillon Aff., Ex. 41, Docket No. 18.)

When Gilbert returned to work in October 2008, she responded to a job posting on MetLife's website for a claim adjustor position, but Vietmeier informed her that the

position was no longer available due to a company-wide freeze on virtual hiring. (*Id.*, Ex. 42.) An internal MetLife document lists Gilbert as "not suitable for phone screen" on October 6, 2008 regarding her application for a casualty claim adjustor position. (Second Baillon Aff., Ex. 44, Docket No. 19.)   With no other position offered, Gilbert's employment was terminated on October 13, 2008.[3] (*Id.*, Ex. 48.)

Of the six available virtual supervisor positions in the Freeport office, the two casualty supervisor positions were filled by Millford and Thilges. (Second Baillon Aff., Ex. 47, Docket No. 19.) Two AIU supervisor positions were filled by two individuals who had been AIU supervisors in Bloomington. (*Id.*)   One had received the strongest rating in her 2007 performance review and the other worked in a specialized unit, the antique auto unit, within AIU; both received favorable interview scores as well. (Vietmeier Dep. at 203–05, 219–21, Docket No.19.)   Two no-fault supervisor positions were filled by Winona Woodworth and Jeff Kemp. (Second Baillon Aff., Ex. 47, Docket No. 19.)   Woodworth had been a no-fault supervisor in Bloomington and was, according to Vietmeier's testimony, a high performer who also gave a good interview. (Vietmeier Dep. at 202, Docket No. 19.)   Kemp, as discussed above, had been a no-fault manager in Bloomington and had received the interview questions in advance. (*Id.* at 51.)

MetLife's records indicate that of all the employees not re-hired or placed in new positions when the office closed, **Gilbert was the only one "terminated."** (Second Baillon Aff., Ex. 48, Docket No. 19.)   All others not re-hired were either (a) subject to a

---

[3] MetLife has hired at least one external candidate subsequent to the office closings, although the timing of that hire is unclear from the record. (Vietmeier Dep. at 121, Docket No. 19.)

temporary assignment that ended, (b) transferred to another office, (c) voluntarily resigned or retired, or (d) their positions (including that of a customer service supervisor) were entirely eliminated. (*Id.*) MetLife does not appear to contest Gilbert's allegation that she was **the only Bloomington supervisor not retained in some capacity.** (*Id.,* Ex. 1.) Those retained included supervisors with recent performance evaluations comparable to or worse than Gilbert's. (*Id.*) Two other Bloomington supervisors were offered non-supervisory positions as claim adjustors. (*Id.*) Steven Bischell, another Bloomington supervisor who was not "a people person," and whose interview was not as effective as those of the individuals hired for the Freeport supervisor positions, was nonetheless hired as a supervisor in another office. (*Id.*; Gaffigan Dep. at 103–04, Docket No. 19; Second Baillon Aff., Ex. 49, Docket No. 19.)

Gilbert filed a charge of disability and age discrimination with the Minnesota Department of Human Rights (MDHR) on December 22, 2008 and filed suit on July 9, 2010. Her complaint alleges only disability discrimination.

## ANALYSIS

## I.   STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II.   TERMINATION ON THE BASIS OF DISABILITY

The MHRA prohibits an employer from discharging or discriminating against a person "with respect to hiring, tenure, compensation, terms, upgrading, conditions, facilities, or privileges of employment" because of disability. Minn. Stat. § 363A.08 subd. 2(2)-(3). Minnesota courts frequently rely on caselaw regarding analogous federal laws, specifically the Americans with Disabilities Act (ADA), to guide their interpretations of the MHRA. *See, e.g., Kolton v. Cnty. of Anoka,* 645 N.W.2d 403, 408– 10 (Minn. 2002); *see also Philip v. Ford Motor Co.*, 328 F.3d 1020, 1023 n.3 (8th Cir. 2003) ("Claims arising under the MHRA are analyzed using the same standard applied to ADA claims.").

MHRA disability discrimination claims are typically analyzed through the burden shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802– 05 (1973). *See Hoover v. Norwest Private Mortg. Banking*, 632 N.W.2d 534, 542 (Minn. 2001). Under this framework, once the plaintiff establishes a prima facie case of discrimination, "the burden of production then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its adverse employment action. If the employer articulates such a reason, the plaintiff must then put forward sufficient evidence to

demonstrate that the employer's proffered explanation was a pretext for discrimination." *Goins v. W. Grp.*, 635 N.W.2d 717, 724 (Minn. 2001). "Although the prima facie case varies depending on the type of employment decision that is challenged, its purpose is to disprove the most obvious legitimate bases for the employment decision, thereby allowing the inference that the decision was motivated by discrimination." *Friend v. Gopher Co., Inc.*, 771 N.W.2d 33, 37 (Minn. Ct. App. 2009). Accordingly, under the *McDonnell Douglas* framework discrimination is proved "indirectly, or circumstantially." *Id.*

If a plaintiff proffers sufficiently strong evidence of discrimination, however, she may defeat a summary judgment motion under the "the direct-evidence framework" without resort to the *McDonnell Douglas* analysis. *Id.* at 40. As the Eighth Circuit has explained,

> "direct" refers to the causal strength of the proof, not whether it is "circumstantial" evidence. A plaintiff with strong (direct) evidence that illegal discrimination motivated the employer's adverse action does not need the three-part *McDonnell Douglas* analysis to get to the jury, regardless of whether his strong evidence is circumstantial. But if the plaintiff lacks evidence that clearly points to the presence of an illegal motive, he must avoid summary judgment by creating the requisite inference of unlawful discrimination through the *McDonnell Douglas* analysis, including sufficient evidence of pretext.

*Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004).

Gilbert argues that she has proffered evidence of disability discrimination strong enough to warrant the direct evidence framework. "Direct evidence is evidence of conduct or statements by the employer's decisionmakers sufficient to permit a fact-finder to infer that the discriminatory attitude was more likely than not a motivating factor in the

employer's adverse employment decision." *Taylor v. LSI Corp. of Am.*, 781 N.W.2d 912, 917 (Minn. Ct. App. 2010). Direct evidence "shows that the employer's discrimination was purposeful, intentional or overt[;]" for example, a statement or policy that is "discriminatory on its face" is direct evidence of discrimination. *Goins*, 635 N.W.2d at 722.

In support of her argument, Gilbert points to alleged admissions by Elrod and Watkins that Gilbert's disability was a motivating factor in its decision not to retain her.[4] Watkins testified that Gilbert's reliance on colleagues to answer the telephone for her might hinder her ability to be successful in a virtual position. Watkins' notes indicated her intent to explain to Gilbert that although her "past performance is acceptable, . . . it will be difficult for [her] to accomplish the same virtually." (First Baillon Aff., Ex. 35, Docket No. 18.)

Even assuming that Watkins' statements warrant the direct evidence framework, all record evidence suggests that Vietmeier, the Freeport field director, was responsible for selecting employees to fill the Freeport virtual positions subject to assistant vice-president Romano's final approval. Watkins was a field director for Bloomington. Vietmeier may have considered Watkins' assessments of candidates but it appears that she retained authority for the hiring decisions. "[S]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself" do not constitute

---

[4] Gilbert also cites MetLife's statement in its MDHR response that Gilbert's "communication difficulties were obvious" but that "this was not a significant factor in the selection process." This statement, assuming it is admissible, is not the type of evidence that enables a plaintiff to avoid the *McDonnell Douglas* burden shifting framework. To the contrary, the statement reflects MetLife's assertion that Gilbert's disability did **not** motivate its decision.

direct evidence of discrimination. *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 426 (8th Cir. 1999) (internal quotations marks omitted). It is reasonable to infer that decisionmakers were influenced by Watkins' views, but evidence based on inference is better suited for the *McDonnell Douglas* framework. *See Erickson v. Farmland Indus., Inc.*, 271 F.3d 718, 725 (8th Cir. 2001).

Likewise, Gilbert's allegations that decisionmakers knew of and discussed her disability do not directly reflect a discriminatory intent in their decision not to hire her. "A statement that refers to a protected status without reflecting bias is not direct evidence of discrimination." *Fjelsta v. Zogg Dermatology, PLC*, 488 F.3d 804, 810 (8th Cir. 2007). The Court concludes that Gilbert has not proffered evidence sufficient to warrant the "direct evidence" framework.

Turning to the *McDonnell Douglas* burden shifting framework, a prima facie case of discrimination requires a plaintiff to establish

> 1) that she has a disability within the meaning of the ADA or the MHRA (or that her employer thinks she does); 2) that she is qualified to perform the essential functions of her job, with or without reasonable accommodation; and 3) that she has suffered an adverse employment action as a result of her disability.

*Burchett v. Target Corp.*, 340 F.3d 510, 516 (8th Cir. 2003). "The required prima facie showing is a flexible evidentiary standard that was never intended to be rigid, mechanized, or ritualistic." *Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010) (internal quotation marks omitted). "The touchstone inquiry remains whether circumstances permit a reasonable inference of discrimination." *Id.* at 1040.

MetLife directly challenges only the third element of Gilbert's prima facie case, whether she has proffered sufficient record evidence from which a factfinder could conclude that she suffered an adverse employment action as a result of her disability. First, MetLife argues that undisputed record evidence shows that Thilges and Millford were better qualified for the virtual casualty supervisor position and virtual casualty/litigation supervisor position, so Gilbert cannot establish that she was rejected from those positions because of her disability. Although Gilbert correctly challenges the legitimacy of the interview scores,[5] undisputed record evidence shows that Millford and Thilges were better qualified than Gilbert regardless of the interviews.

Specifically, Millford, who was chosen to fill the casualty/litigation position, had a degree of experience in the insurance business comparable to that of Gilbert; unlike her, however, he also had a law degree, had worked as a litigation supervisor for several years, and was described by Vietmeier as "a valued member of the team." (Vietmeier Dep. at 222–23, Docket No. 19.) Gilbert's contention that a law degree is not **required** to be a litigation supervisor does not disrupt MetLife's assertion that Millford was a comparatively stronger candidate. Thilges, chosen to fill the casualty supervisor position, was considered a "high performer" who, unlike Gilbert, had a master's degree in insurance, had received a "Best of the Best" award, and was a "structured settlement champion . . . ." Structured settlement was an area in which Gilbert admitted difficulty.

---

[5] Gilbert's answers seem substantively comparable to the other candidates' but unlike them she typed her answers onto a laptop because of her disability. Moreover, the interview questions were disseminated to at least some candidates in advance (a "secret") and a jury could conclude Thilges was at a comparative advantage since he was selected to **conduct** interviews for the Freeport claim adjustor positions.

Millford and Thilges' higher qualifications, however, cannot support a grant of summary judgment to MetLife because Gilbert has raised a triable issue about whether she was or should have been considered for **positions other than the two casualty supervisor jobs**. According to MetLife, Gilbert was not seriously considered for another supervisor position because MetLife gave priority to those employees who applied for the same virtual position in Freeport that they had previously held in Bloomington; however, MetLife has not cited evidence that supports this proposition. To the contrary, record evidence suggests that MetLife took steps to retain supervisory and management level employees in **some capacity** even if they were not hired to perform the job they had held in Bloomington. Romano's email, for example, indicates that Kemp may have been offered the no-fault supervisor job before interviews commenced because his manager position would not exist in the new virtual office. Two Bloomington supervisors not hired for virtual positions, including one whose last performance review was a three and who received the same interview score as Gilbert, were offered jobs as claim adjustors. In addition, one Bloomington supervisor who gave a sub-par interview and was passed over for the Freeport supervisor positions was nonetheless hired as a supervisor in another office.

From this and other record evidence, a reasonable factfinder could infer that MetLife sought placements for supervisory employees who (a) received performance ratings comparable to or worse than Gilbert's, (b) did not interview well, and (c) were not the best candidates for the virtual positions. MetLife did not, however, retain Gilbert. Evidence that similarly-situated employees without disabilities were treated more

favorably, as here, can give rise to an inference of discrimination. *See McNary v. Schreiber Foods, Inc.*, 535 F.3d 765, 770 (8th Cir. 2008).

MetLife emphasizes that Gilbert did not apply for a claim adjustor position. However, it is possible that Gilbert's initial decision not to apply for the virtual claim adjustor jobs was based on MetLife's failure to fully inform her about the transition to the extent that other supervisors were informed. Gilbert was out of the office because of her chemotherapy when MetLife announced the closure to its employees and provided details about the application process. Toussaint testified that he did not recall whether he advised Gilbert to apply for other positions. Moreover, MetLife described Gilbert as "not suitable for phone screen" with regard to her subsequent application for a casualty claim adjustor position, and **Watkins' notes indicate that MetLife did consider Gilbert for an adjustor job** but determined she "could not be successful" in that position. (First Baillon Aff., Ex. 35, Docket No. 18.) The example of Kemp – the manager who was essentially hired to be a no-fault supervisor before the office closure was announced – further suggests that MetLife was willing to take steps to retain employees in demoted positions regardless of whether they explicitly expressed interest in such positions.

In addition, "[p]laintiffs may satisfy the [causation] element [of their prima facie case] through other types of evidence" besides evidence similarly-situated non-disabled employees were treated more favorably, including but not limited to comments from which a factfinder could infer discriminatory intent. *Lewis*, 591 F.3d at 1040; *see also Putman v. Unity Health Sys.*, 348 F.3d 732, 736 (8th Cir. 2003) ("[E]vidence of pretext-

normally considered only at step three of the *McDonnell Douglas* analysis-[can also] satisf[y] this aspect of the plaintiff's prima facie case burden.")

Here, several pieces of evidence, taken together, give rise to a prima facie case of disability discrimination in Gilbert's termination even without the inference that similarly situated employees without disabilities were treated differently. First, before the closure announcement, Romano, the company's vice president, expressed concern about the "unique situation of the supervisor in Bloomington that had her voice box removed" and a desire to know the "rules" that might apply. The possibility of Gilbert taking disability leave during the transition was discussed by Romano and other decisionmakers. Watkins admitted that Gilbert performed her job – which included supervising two virtual employees and working from home intermittently – satisfactorily, but she clearly believed that Gilbert's disability would hinder her ability to succeed as a virtual supervisor.[6] Watkins shared her concern with Romano and, according to Vietmeier, Watkins' assessment was a factor used in considering an applicant. In addition, Vietmeier described Gilbert as "fragile" and "weak." While she made that comment in her deposition years after the hiring was completed, a factfinder could infer from it that Vietmeier thought less of Gilbert because of her disability.

Critically, Gilbert alleges that she was the **only** Bloomington supervisor not retained in some capacity, and MetLife has not proffered conclusive evidence to the contrary. Gilbert was the only Bloomington employee not retained who was listed as

---

[6] Notably, Gilbert was already supervising employees virtually and had worked from home without incident for fifteen to eighteen months preceding her termination.

"terminated" on MetLife's records. Apparently concerned about the repercussions of not retaining Gilbert, Elrod requested "more detail than we currently have" to support the decision. Shortly before MetLife informed Gilbert that she had not been selected for a virtual position and just after denying her request to work remotely as a disability accommodation, Toussaint suggested to Watkins that he track Gilbert's progress on a daily basis going forward; his email was forwarded to Romano and Elrod. Neither Elrod nor Watkins recalled receiving similar messages about other employees. Finally, an internal MetLife document lists Gilbert as "not suitable for phone screen" with regard to her application for a casualty claim adjustor position. As MetLife's counsel acknowledged at oral argument, however, the record is not clear that Gilbert was not qualified for the job of claim adjustor.

MetLife points to Gilbert's admissions that no employee made statements about her disability that Gilbert considered inappropriate and that MetLife handled her need for accommodations and leave time in 2006 appropriately. Moreover, as MetLife observes, the company hired Gilbert in 2000 when it was aware of her cancer diagnosis. This evidence, among other evidence, is certainly favorable to MetLife and from it a factfinder might conclude that MetLife's decision to terminate Gilbert's employment was non-discriminatory. At the summary judgment stage, however, the question is whether Gilbert's evidence could support an inference that she lost her job because of her disability. The Court concludes that, viewed in its totality, the record evidence could support that inference.

Since Gilbert has established a prima facie case of discrimination, MetLife must articulate a legitimate, nondiscriminatory reason for its adverse employment action. *Goins*, 635 N.W.2d at 724. Because MetLife asserts that the casualty supervisor and casualty/litigation supervisor positions are the only two jobs at issue in this case, it relies on Thilges and Millford's superior qualifications and interview answers to support its decision not to hire Gilbert. However, as discussed above, there is a material factual dispute regarding whether MetLife could have or should have considered her for other positions as well despite her initial failure to apply for them.

Accordingly, the same evidence supporting Gilbert's prima facie case of discrimination similarly supports an inference that MetLife's proffered reasons for not retaining her in any capacity are pretextual. Supervisors with comparable experience and comparable or worse performance ratings and interview scores were nonetheless retained by MetLife. There was a flurry of internal correspondence preceding the office closure about Gilbert's ability to do the virtual job (per Watkins) and the likelihood of her taking disability leave during the transition (per Romano and Elrod). Vietmeier and other MetLife employees testified that Gilbert's disability played no role in its decision, but Watkins believed that Gilbert's communication needs would hinder her success as a virtual supervisor; she shared this information with decisionmakers and planned to use it as a justification for the company's decision not to hire Gilbert. These facts, with other record evidence, "amount to a showing that the prohibited reason, rather than the proffered reason, actually motivated the employer's action." *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120–21 (8th Cir. 2006).

While a jury need not believe Gilbert's evidence that MetLife's decision to terminate her was discriminatory, Gilbert has established material factual disputes that require the Court to deny MetLife's motion for summary judgment on this claim.

## III.   FAILURE TO ACCOMMODATE

Under the MHRA, an employer discriminates on the basis of disability by "not . . . mak[ing] reasonable accommodation to the known disability of a qualified disabled person or job applicant unless . . . the accommodation would impose an undue hardship . . . ." Minn. Stat. § 363A.08, subd. 6(a). "'Reasonable accommodation' means steps which must be taken to accommodate the known physical or mental limitations of a qualified disabled person." *Id.* The *McDonnell Douglas* framework does not apply to a reasonable accommodation claim. *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 788 (8th Cir. 2004). "An employee claiming that her employer violated Minn. Stat. § 363A.08, subd. 6, need only produce competent evidence that she had a disability, her employer knew of the disability, and her employer failed to make a reasonable accommodation for that disability to defeat summary judgment." *Ferguson v. C/Base, Inc.*, No. A08-2125, 2009 WL 2927961, at *2 (Minn. Ct. App. Sept. 15, 2009).

While not conceding that Gilbert had a disability or that MetLife knew of the disability, MetLife only argues that it is entitled to summary judgment on Gilbert's failure to accommodate claim because MetLife provided Gilbert several accommodations during her tenure. (*See, e.g.*, Gilbert Dep. at 29-30, 35-36, 133, Docket No. 19.) However, Gilbert's failure to accommodate claim is based upon MetLife's belief, as

reflected in Watkins' notes and testimony, that Gilbert could not succeed in **any** virtual job because of her disability.

MetLife asserts that Gilbert cannot establish a need for reasonable accommodations in the future in positions for which she was not retained or hired. In *Kammueller*, however, the Eighth Circuit considered claims for both disability-based termination/failure to retain **and** failure to accommodate under the MHRA brought by a disabled employee terminated after a substantial reduction in force. 383 F.3d at 782-83. The employer had accommodated the employee through modifications including the waiver of a lifting requirement, but subsequently determined after the reduction that the lifting requirement was an essential job function and that the employee's inability to fulfill it warranted his termination. *Id.* The Eighth Circuit concluded that material factual disputes regarding whether the lifting requirement was essential and whether reasonable accommodations would enable the employee to perform the job precluded a grant of summary judgment to the employer on the failure to accommodate claim. *Id.* at 787. As an example of a potential reasonable accommodation, the court looked no further than the possibility of returning the employee to the position which he had held for several years. *Id.*

Like the plaintiff in *Kammueller*, Gilbert asserts that MetLife's failure to retain her in some capacity based on its belief that communication issues would interfere with her success, despite her acceptable prior performance with accommodations, supports a

failure to accommodate claim in addition to her general disability discrimination claim.[7]

Watkins' notes suggest that MetLife "looked at all the positions and d[id] not feel

[Gilbert] could be successful **as a claim representative** . . . . [M]oving into a virtual

concept will be more difficult for [Gilbert]." (First Baillon Aff., Ex. 35, Docket No. 18

(emphasis added).)  At oral argument, MetLife's counsel confirmed MetLife's position

that Gilbert was "probably" not qualified for a claim adjustor position because of

limitations on her ability to communicate with clients.  He also admitted, however, that

"the record didn't get there."

Gilbert had worked as a claim adjustor previously, and was by several accounts

performing acceptably in a virtual context with accommodations prior to her termination.

A jury could infer that MetLife failed to accommodate Gilbert's disability by not

considering, **at a minimum**, how its existing accommodations (such as the use of instant

messaging)[8] might ameliorate any potential hindrance to her performance as a virtual

supervisor or claim adjustor.

MetLife's contention that Gilbert failed to request any particular accommodation

for the virtual positions is therefore unavailing.  Given Gilbert's history of requesting

(and generally receiving) disability-related accommodations from MetLife, a factfinder

could conclude that Gilbert provided MetLife with "enough information that, under the

---

[7] Courts have recognized the intersectionality of termination/failure to hire claims and failure to accommodate claims in the context of the ADA. *See, e.g., Bartee v. Michelin N. Am., Inc.*, 374 F.3d 906, 912 n.5 (10th Cir. 2004) (considering, without deciding, whether wrongful termination and failure to reasonably accommodate are separate causes of action under the ADA or alternative methods of proving one statutory cause of action).

[8] Gilbert has also suggested numerous other accommodations that might have enabled her to work in a virtual capacity.

circumstances, [MetLife] can be fairly said to know that [Gilbert] sought accommodation for [her] disability." *Ballard v. Rubin*, 284 F.3d 957, 962 (8th Cir. 2002) (internal quotation marks omitted). The scope of MetLife's accommodation obligation "is determined through an informal, interactive process" with Gilbert, a process that a factfinder could conclude it entirely failed to engage in before determining that Gilbert could not be successful in a virtual job. *Id.* at 960 (internal quotation marks omitted). While "[t]he mere failure of an employer to engage in the interactive process does not give rise to *per se* liability, . . . for summary judgment purposes such failure is considered prima facie evidence that the employer may be acting in bad faith." *Id.*

Under established Eighth Circuit precedent, MetLife is not entitled to summary judgment on Gilbert's failure to accommodate claim.

## IV.   ORDER TO SHOW CAUSE

Numerous submissions in support of the parties' motion papers were filed under seal. However, when the Court heard oral argument on this motion, neither party expressed concern regarding the applicability of the Protective Order (Docket No. 8) to any piece of record evidence discussed in connection with the motion. Accordingly, the Court orders the parties to show cause ten days from the date of this order why the order should not be unsealed, and to specify any portion of the order warranting redaction.

This case will be placed on the Court's next available trial calendar

## ORDER

Based on the foregoing, and the records, files, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Defendants' motion for summary judgment [Docket No. 11] is **DENIED**;

2.      Defendant Metlife, Inc. is dismissed from this lawsuit;

3.      The parties shall show cause on or before ten (10) days from the date of this Order why the Court should not unseal the Order, and to specify any portion of the order warranting redaction.

DATED:  March 14, 2011
at Minneapolis, Minnesota.

s/ John R. Tunheim
_____
JOHN R. TUNHEIM
United States District Judge